## NORTHERN CENTRAL RAILWAY COMPANY *vs.* JOHN H. PRENTISS.

To constitute an *original undertaking* to pay for services to be rendered another, it is necessary that they should be rendered not only at the *instance and request*, but also *upon the credit* of the party undertaking to pay for them.

A physician attended, for several days, as his patient, a man who had been injured by a rail road accident, and whilst this attendance was going on, the rail road company, by its agent, requested him to continue his attendance, and promised that the company would pay him for his services. HELD:

That this did not amount to an original undertaking or promise on the part of the company to pay for future services, unless the jury should believe they were rendered upon the *credit* of the *company*, and not upon that of the *patient*.

APPEAL from the Court of Common Pleas.

*Assumpsit* brought by the appellee against the appellant, to recover the sum of $400, for services as physician and apothecary, alleged in the declaration to have been rendered by the plaintiff, *at the special instance and request of the defendant*, for one William Steinhagan, who had been severely injured by an accident on the Baltimore & Susquehanna Rail Road, on the 4th of July 1854. The declaration avers, that the defendant had succeeded to all the rights and liabilities of the Baltimore & Susquehanna Rail Road Company, by virtue of the act of 1854, ch. 250. It contains a *quantum meruit* count and the common money counts. Plea, *non assumpsit*.

*Exception.* The evidence in the case is fully stated in the opinion of this court, as is also the prayer on the part of the plaintiff, which was granted by the court below.   Two prayers were offered on the part of the defendant:

1st. That the plaintiff is not entitled to recover in this case, unless the jury shall be satisfied, from the evidence, that the professional services sued for, were rendered at the instance of the defendant, or its agent, and that there is no evidence to go to the jury to show that they were so rendered.

2nd. That if the jury are satisfied, from the evidence, that the plaintiff was employed in the first instance to render the services sued for, not by the defendant or its agent, but by other persons, then that the defendant is not liable in this action, because there is no evidence of any written undertaking, on its part, to pay or be responsible for the same.

The court (MARSHALL, J.,) granted the plaintiff's prayer, but refused both of the defendant's.   To this ruling the defendant excepted, and the verdict and judgment being in favor of the plaintiff for $213.16, with interest and costs, appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON, TUCK and BARTOL, J.

*Bernard Carter* and *J. M. Campbell* for the appellant:

The instruction granted by the court below was clearly erroneous, because there was no evidence competent to go to the jury, that any portion of the services sued for in this action, were rendered at the request of the defendant.   The evidence in the record clearly shows that the appellee was originally employed to render his professional services to Steinhagen, by an individual in no way connected with, nor in any respect acting for the rail road company, or any of its agents.   The obligation to pay for these services was, therefore, the debt of Steinhagen, or of the person employing the plaintiff, and could only be assumed by the rail road company by a written instrument.   To constitute this an *original undertaking* on the part of the company, the services must have been rendered at the request and *upon the credit* of the company, and *no credit*

must have been given to Steinhagen. If the services were rendered originally at the request or instance of Steinhagen, the party injured by the accident, then the company's coming in and assuming to pay for them, was clearly a *collateral* undertaking, and must be in writing. 14 *Wend.*, 247, *Larson vs. Wyman.* 6 *Pick.*, 511, *Tileston vs. Nettleton.* 15 *Pick.*, 169, *Loomis vs. Newhall.* 3 *Pick.*, 207, *Mills vs. Wyman.* 4 *Md. Rep.*, 476, *Ellicott vs. Peterson.* 7 *H. & J.*, 391, *Elder vs. Warfield.* 12 *Verm.*, 38, *Sinclair vs. Richardson.* 5 *Wend.*, 277, *King vs. Despard.* 5 *Hill*, 483, *Carville vs. Crane.*

*John T. Morris* and *Edward O. Hinkley* for the appellee, argued:

1st. That the defendant's *first prayer* takes from the jury the questions of fact, whether the services of the plaintiff, or any of them, were rendered at the instance of the defendant. *The manner of communicating the promise,* in this case, is not objectionable; for if a promise be made generally to any person who shall do a certain thing, the person who does it may maintain *assumpsit* upon it. 2 *Root*, 119, *Bull vs. Talcot.* 1 *Jones' Law Rep., (N. C.)* 10, *Buie vs. Shipman.* 1 *Zabriskie*, 310, *Furman vs. Parke.* 5 *Metcalf*, 56, *Freeman vs. City of Boston.* 6 *Mass.*, 344, *Symmes vs. Frazier.* *The consideration* for the promise in this case is sufficient; for any act done, trouble or inconvenience, is sufficient. 17 *Conn.*, 517, *Clark vs. Sigourney.* And it matters not that the *consideration* was a *past* one, if it was *beneficial to the defendant,* or if there was a *subsisting legal obligation.* Wherever the law would *imply* a promise, an *express* promise made after the execution of the contract, is considered to be founded on a *good consideration,* and the jury may infer a request from the circumstances. 10 *Johns.*, 243, *Hicks vs. Burhans.* 14 *Do.*, 192, *Oatfield vs. Warring.* *Ibid*, 378, *Doty vs. Wilson.* 4 *Foster's (N. H.) Rep.*, 546, *Wilson vs. Edmonds.* *Broom's Legal Maxims*, 50 *Law Lib.*, 344, 345, 348. Now the *circumstances in this case* are such, that the jury might fairly have inferred an *implied* promise. In general, it is the pro-

16      v. 11.

vince of the *jury to determine* the meaning of words used orally, the *intention* of the parties, the question *to whom the credit* was given, and other *similar facts.* 1 *Cushing*, 91, *Thruston vs. Thornton.* 36 *Maine*, 380, *Brown vs. Orland.* 30 *Eng. Law & Eq. Rep.*, 510, *Pearce vs. Blagrave.* And in particular cases, where another person comes in and assumes to pay for them, it is the province of the jury to determine to whom the credit was given, and whether the undertaking is an *original* or a *collateral* one. 1 *H. Bl. Rep.*, 120, *Anderson vs. Hayman.* 21 *Maine*, 312, *Homans vs. Lambard.* 20 *Verm.*, 538, *Arbuckle vs. Hawks.* 7 *H. & J.*, 391, *Elder vs. Warfield. Ibid.*, 417, *Wyman vs. Gray.* 1 *Gill*, 260, *Conolly vs. Kettlewell.* 4 *Md. Rep.*, 492, *Ellicott vs. Peterson.* 1 *Gray*, (*Mass. Rep.*,) 396, *Alger vs. Scoville.* 1 *Compton & Meeson*, 810, *Paynter vs. Williams.*

2nd. The defendant's *second prayer* was likely to mislead the jury by directing their attention solely to the question by whom the plaintiff was employed in the *first instance*, thus impliedly denying them the right to look to the other facts in the case, to see whether the defendant's acts, thereafter, did or did not amount to a ratification of a new contract directly with the defendant, whereby the old one with Steinhagen (if such there was) had been rescinded or superseded; that is, whether *any part* of the services were rendered upon request of the defendant, thus asking for a determination by the *court* that the contract was an *entirety*, which was a question of *fact* for the *jury.* 7 *H. & J.*, 391, *Elder vs. Warfield.* 5 *Wend.*, 277, *King vs. Despard.* 12 *Verm.*, 38, *Sinclair vs. Richardson. Ibid*, 629, *Blood vs. Enos.* 33 *Maine*, 368, *McKeenan vs. Thissel. Broom's Legal Maxims*, 50 *Law Lib.*, 346.

3rd. The *plaintiff's prayer* put the matter in the true light, for the reasons already mentioned in arguing the defendant's prayers. The criterion—the pole-star in all the cases—is *to whom was the credit given*, and this is a question of *fact for the jury.* A careful consideration of this question will reconcile cases seemingly conflicting, cited upon the other side. 7 *H. & J.*, 391, *Elder vs. Warfield.* 6 *Pick.*, 509, *Tileston*

*vs. Nettleton.* 15 *Pick.*, 159, *Loomis vs. Newhall.* 14 *Wend.*, 246, *Larson vs. Wyman.* Where the *fact* is settled, the court will determine, but the *question of fact* cannot be taken from the *jury;* and even if they give an erroneous verdict, this court will not interfere with it, if the instructions of the court below were not wrong.

ECCLESTON, J., delivered the opinion of this court.

This is an action of *assumpsit* instituted by John H. Prentiss, the appellee, against the appellant, to recover the sum of $400, for services rendered by the former as a physician and apothecary, for the benefit of William Steinhagen, who had been severely injured by an accident upon the Baltimore & Susquehanna Rail Road.

The accident occurred on Tuesday, the 4th of July 1854, and Steinhagen was taken to the house of Samuel Getty, the same evening. The next day, Jones, (a witness for the plaintiff,) in going to the city of Baltimore, met Doctor Prentiss, the plaintiff, and told him of Steinhagen's condition, and asked the doctor to go to see him, and attend him, as he had no physician. But Jones says he had no conversation with the doctor as to any authority to employ him. The witness, of his own accord, told the doctor to go to see Steinhagen; and it appears that he did go.

The evidence of Getty shows that the injured man was confined for about eleven weeks, during which time the plaintiff attended him, furnishing him with medicine and wine.

The Sunday after the accident, Mr. Tagart went to the house of Getty, to see Steinhagen.

The plaintiff examined Mr. Tagart as his witness, who stated that he was a director of the Baltimore & Susquehanna Rail Road Company, and counsel for the company; that all the cases arising out of the accident were put under his charge; that in virtue of this authority he went to the house of Getty to see Steinhagen, and told those having care of him not to let him suffer for the want of any comforts that he might wish, and if they would go to the company, they would pay for them; and that he, the witness, was agent and counsel for the

rail road company, for the settlement of pecuniary claims arising out of the accident; that he gave to a certain Parsons an order upon the company for the payment of the money, which, for the company, he had agreed to pay Steinhagen in settlement of his claim for his injuries. And on cross-examination, this witness stated that he did not at any time employ the plaintiff to attend upon Steinhagen; that as agent for the company, he made a settlement with Parsons, who was agent of Steinhagen, for the sum of $1000, which was a full and final settlement of all claims against the company, arising out of the injuries received by Steinhagen, and was intended to include compensation to him, and all doctors' bills, and bills of others who might have any claims against the company, arising from services rendered him; that the witness stated to the parties, at the time, that this must be a full and final settlement of all claims. This witness also said he never would have made any other settlement than a full and final one of all claims, his instructions authorizing such and only such a settlement; that he never made any reservation of the liabilities of the company to the doctors, and never made use of the words, " we will fight the doctors."

The plaintiff's witness, Parsons, stated that he saw Steinhagen the night of the accident; that Doctor Prentiss came to see him the next day, or the next day but one, and attended him from that time during his illness; that on the next Saturday after the accident, Mr. Tagart went to the house of Getty, where Steinhagen was, witness was present when he came, and Tagart told witness and Getty not to let Steinhagen suffer for the want of any thing he might wish, to let him have every thing necessary for his comfort, every thing must be done to save his life. After this, the witness told Doctor Prentiss the rail road company would pay him. This witness was agent for Steinhagen, in the settlement of his claim against the company. The witness stated that Steinhagen wanted $2000, which was to include all doctors' bills and all others; this Mr. Tagart refused; witness afterwards offered to take $1500, out of which Steinhagen was to pay doctors' bills and other bills; this Mr. Tagart refused, and said the company

wanted to fight the doctors, on account of their exorbitant bills; after this, Mr. Tagart offered $1000 to witness; witness asked him to pay, besides this, one hundred dollars to Getty, for taking care of Steinhagen; this was refused; witness then accepted the offer of $1000. As he was leaving Tagart, witness said, this "does not include doctors' bills;" Tagart said "no, we will fight the doctors." The understanding of witness was, that the company was to pay the doctors; and if any thing is in the release contrary to this, it is a fraud. On cross-examination, this witness said that Steinhagen and his father (the son being a minor) executed a release to the company of all claims against the latter; that Mr. Tagart told the witness he was only authorized to give $1000 in settlement of Steinhagen's claim. The witness went, at the request of Mr. Tagart, to find out the amount of doctors' bills, before the settlement. Doctor Bull was called in some time after witness saw Mr. Tagart, at Getty's house.

Starr, a witness for the plaintiff, stated that he went with Parsons and Getty to make a settlement of Steinhagen's claim with Mr. Tagart; that Parsons asked $2000 the first time, which was refused; the second time $1500 was asked, including doctors' and other bills, this Mr. Tagart refused, saying the company considered the doctors' bills exorbitant, and wanted to fight the doctors. Witness was not present when Tagart and Parsons settled for $1000.

The witness Getty, called by the plaintiff, said that when Parsons offered to settle for $1500, and pay all bills, Tagart refused, and said the doctors want to extortion on the company, and we will fight them; we want to know what's the lowest cent you will take yourself.

Rhinehardt, a witness for the plaintiff, said he made an apparatus called Smith's patent, for one of the persons injured in the accident on the 4th of July, which Doctor Prentiss had ordered. The rail road company paid for this, but refused to do so until witness produced the certificate of the doctor who had ordered it. Doctor Prentiss certified to its correctness; thereupon they paid for it.

The defendant then gave in evidence a release of all claims

and demands given by Steinhagen and his father; in consideration of $1000, and proved the payment of that sum. It likewise gave in evidence a receipt from Samuel Getty for $16, for an apparatus for William Steinhagen's leg.

The plaintiff asked the following instruction: "That if the jury believe, from the evidence, that the plaintiff rendered the services, or any portion of them, sued for in this case, at the instance or request of the defendant, and acting under the authority of its agent or agents, then the said company is responsible for the payment of the value of such services as were rendered at the instance of the defendant, as an original undertaking of their own." And this instruction was given.

The verdict and judgment being in favor of the plaintiff, the defendant appealed.

Two prayers were presented by the defendant, which the court refused to give; but the views which will be expressed in this opinion, in regard to the prayer of the plaintiff, render it unnecessary to notice those of the defendant.

At the close of his argument, the senior counsel of the appellant abandoned all reliance upon any alleged difference between the corporate powers or liabilities of the Baltimore & Susquehanna Rail road Company and those of the Northern Central Railway Company; whether such alleged difference is considered with reference to the language of the plaintiff's prayer, or with regard to the responsibility of the latter company for the engagements, contracts or liabilities of the former.

The plaintiff contends, that under the proof in this case, the court did right in instructing the jury, that if they should believe the services sued for, or any portion of them, were rendered by the plaintiff, at the *instance or request* of the rail road company, or its agent, then the company is responsible for the services so rendered, and responsible for the same as an original undertaking by the company. The original undertaking here alluded to, is in contradistinction to a collateral promise. And the legal proposition asserted is, that if A renders services to B, at the instance or request of C, this creates an original and not a collateral engagement on the part of C to pay for the services, without the necessity of ascertaining

whether A has rendered the services upon the credit of B, or that of C. But we do not so understand the law.

Conceding (without meaning to say whether there is or is not) sufficient evidence to warrant the jury in believing the agent of the company requested the doctor to attend the injured man, and said the company would pay for such attendance, still it is true, beyond all controversy, that if the agent did so, it was not until after the doctor had been visiting the injured man, as his patient, for several days. Now, if for the medical attendance thus going on, there was no express contract or promise to pay, there was, at least, an implied promise on the part of the patient. And if, under those circumstances, the agent of the company requested the doctor to continue his attendance, and added that the company would pay him for his services, still that would not amount to an original undertaking or promise to pay for future services, unless the jury should believe they were rendered upon the *credit* of the company, and not upon that of the patient.

In *Elder vs. Warfield*, 7 *H. & J.*, 396, the court say it is the general rule "that wherever the party undertaken for is originally liable upon the same contract, the promise to answer for that liability is a collateral promise, and must be in writing." And again, on page 397, it is said: "But where the party undertaken for is under no original liability, the promise is an original undertaking, and binding upon the party promising, without being in writing. Thus, if B furnishes goods to C, on the express promise of A to pay for them, as if A says to him, let C have goods to such an amount, and I will pay you, and the credit is given to A; in that case, C being under no liability, there is nothing to which the promise of A can be collateral; but A being the immediate debtor, it is his original undertaking, and not a promise to answer for the debt of another." Here the circumstances mentioned as creating an original undertaking on the part of A, include not only the delivery of goods to C by B, at the *request* of A, and on his promise to pay for them, but also the delivery of them upon the *credit* of A, there being no liability on the part of C.

In *Ellicott vs. Peterson's Ex'crs*, 4 *Md. Rep.*, 492, the

court say: "It was not a *collateral,* but an *original* undertaking, for although the children might have been responsible, under other circumstances than those which constitute this case, for the support, &c., extended to them by their stepfather, yet that support, &c., was extended not on their credit, either express or implied, but *solely* on the credit and liability of the testator of the defendants. Where there is no credit given to the party who receives the benefit of the services rendered, or money advanced, the agreement to pay, by a third party, is an original undertaking, and, for that reason, not within the statute." This is a recognition of the principle stated in *Elder vs. Warfield,* to which case the court refer, and also to *Conolly vs. Kettlewell, et al.,* 1 *Gill,* 260.

The hypothesis of the prayer before us is, that the defendant is liable as having made an original and not a collateral promise, if the jury believed that the doctor's services, or any portion of them, were rendered by him at the *instance or request* of the defendant. It does not submit to the jury any inquiry whether such services were rendered upon the *credit* of the defendant. For the failure to do this, we think it should not have been granted; consequently the judgment will be reversed.

*Judgment reversed, and procedendo awarded.*